UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Shequita A. Heard,                                        Civ. No. 17-2940 (PAM/ECW)

               Plaintiff,

v.                                                        **MEMORANDUM AND ORDER**

City of Red Wing, Officer
Justin Hesse, and Officer
Nick Sather,

               Defendants.

---

This matter is before the Court on Defendants' Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment. For the following reasons, the Motions are denied.

**BACKGROUND**

At approximately 7:00 pm on August 7, 2016, the Red Wing police department received a 9-1-1 call complaining about drug traffic and parking problems on Putnam Avenue in Red Wing, Minnesota. The caller stated only that she was "tired of people parking in front of my house to get drugs from another house" and that she lived on Putnam Avenue; she hung up without giving the operator any further information. (Leyderman Decl. (Docket No. 45) Ex. 1.) Defendant Officer Nick Sather was familiar with the area and knew that there was a "drug house" on Putnam Avenue; he drove his cruiser down the street shortly after the call came in. (Hodkinson Aff. Ex. 14 (Docket No. 40-14) (Sather Dep.) at 41.) A silver vehicle that he did not recognize drove past him. (Id. at 31-32.) He turned his cruiser around, planning to stop the vehicle, but he was unable to catch up to the

car. (Id. at 33.) He believed the car was trying to elude him, so he radioed dispatch and asked other officers to be on the lookout for the vehicle. (Hodkinson Aff. Ex. 2 (Docket No. 40-2) (Supp. Sather Report) at 1.)

A few minutes later, Defendant Officer Justin Hesse saw a vehicle matching Sather's description parking outside a house on West Sixth Street. (Hodkinson Aff. Ex. 15 (Docket No. 40-15) (Hesse Dep.) at 36.) As he was driving toward the vehicle, Plaintiff Shequita Heard emerged from the driver's side of the car. Hesse stopped his cruiser in the middle of the street and activated his lights. (Leyderman Decl. Ex. 2 (Hesse Squad Video) at 19:16:00.) Heard's brother got out of the passenger side of the car, and together they walked toward the home. There were several other individuals on the home's front porch at the time.

Hesse got out of his squad car and followed Heard toward the house. (Id. at 19:16:46.) He asked Heard to stop, telling her that, "We had a driving complaint." (Id. at 19:16:56.) Heard continued walking, eventually going up the steps onto the home's porch. Hesse followed her onto the porch, followed by Sather, who had also arrived on the scene. The individuals on the porch were yelling at the officers. (Id. at 19:17:30.) Hesse told Heard to "come over here" and she came down the front steps onto the front yard. (Id. at 19:17:20 - :27.) Several other individuals followed Heard and Defendants off the porch. (Id. at 19:17:32.) One of them told Heard, "F*ck them. You don't have to talk to them." (Id. at 19:17:37.)

Less than a minute later, during the course of the parties' conversation, Heard made a comment that caused the officers to handcuff her. (Id. at 19:18:23.) She contends that she told them she would "sue the f*ck out y'all." Sather, however, apparently believed that she said she would "shoot the f*ck out y'all." Sather told Heard that she could not "tell me that you're going to shoot me" and put Heard's arms behind her back. (Id. at 19:18:26.) Heard's brother was recording the events on his cell phone, and yelled, "She said sue! She said sue!" (Leyderman Decl. Ex. 4 (Cell Phone Video) at 0:01:00.)

According to Defendants, Heard continued to refuse to cooperate, and they were forced to take her to the ground to handcuff her. According to Heard, she did what the officers told her to do, although she concedes that she initially pulled her arm away when Sather first touched her. Hesse's squad video shows both officers taking Heard to the ground less than five seconds after Sather first pulled Heard's arms behind her back. (Hesse Squad Video at 19:18:31.) Sather told Heard that she was under arrest for terroristic threats and obstruction. (Id. at 19:18:59.)

Sather placed Heard in his squad car, and they engaged in a conversation about what had happened. Heard told Sather that she had said that she was going to shoot a video of them. (Leyderman Decl. Ex. 3 (Sather Squad Video) at 19:20:40.) Sather eventually transported Heard to the emergency room, and according to the parties she was thereafter taken to the county jail, where she remained for two days. Although she was charged with Obstructing Legal Process, Disorderly Conduct, and Threats of Violence, the county attorney dismissed the charges. Heard claims that she required shoulder surgery as a result of the take-down and that she still experiences pain in her shoulder.

3

Heard's Complaint raises five counts. The first three are claims under 42 U.S.C. § 1983: Count 1 claims First Amendment retaliation against Hesse and Sather; Count 2 claims unreasonable seizure and excessive force against the officers in violation of the Fourth Amendment, and Count 3 claims unreasonable seizure, false arrest, post-arrest detention, and malicious prosecution against the officers, also in violation of the Fourth Amendment. Counts 4 and 5 raise claims under state law, specifically battery and malicious prosecution, and are brought against the officers and the City.

Heard initially named several other Red Wing police officers as Defendants, but recently dismissed her claims against them. (Docket No. 35.) Only Hesse, Sather, and the City remain, and they now seek summary judgment, contending that qualified and official immunity bar Heard's claims. Heard cross-moves for summary judgment, arguing that there are no issues of fact on her claims under the Fourth Amendment.

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson

4

v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**A.     Qualified Immunity**

Qualified immunity protects police officers from suit unless "their conduct . . . violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To evaluate whether an officer is entitled to qualified immunity, the Court must determine whether the facts alleged "make out a violation of a constitutional right." Pearson v. Callahan, 555 U.S. 223, 232 (2009). The Court must also determine whether the right at issue was "clearly established" at the time of the alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Thus, a police officer is "entitled to summary judgment based on qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." Capps v. Olson, 780 F.3d 879, 884 (8th Cir. 2015).

The Supreme Court has recently emphasized that the qualified-immunity inquiry should focus on whether there are any cases "where an officer acting under similar circumstances as [the defendant officer] was held to have violated the [Constitution.]" White v. Pauly, 137 S. Ct. 548, 552 (2017). In other words, while there does not have to be a case "'directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. at 551 (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)).

**B.     Unreasonable Seizure**

Police are entitled to investigative stops and brief detentions, called Terry stops, when there is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). The reasonable suspicion required is less than probable cause. United States v. Sokolow, 490 U.S. 1, 7 (1989). Heard argues that Officer Sather did not have the requisite particularized basis for instigating the stop here. If the stop itself was unconstitutional, then she argues that any use of force was improper.

Heard relies on Thompson v. Reuting, 968 F.2d 756 (8th Cir. 1992) to support her contention that the stop was unconstitutional as a matter of law. In Thompson, the police received reports of a suspicious brown Chevy Nova in a particular area of Omaha. Id. at 758. When the police officer arrived in the area, the Nova was the only car in the area. The officer was experienced, had lived in the neighborhood, and knew it was a high-crime area. Id. It was dark, and the officer could not tell how many people were in the Nova or what they looked like. Id. He followed the Nova for several blocks and did not observe it violating any laws, but he nevertheless decided to stop the car. Id.

The Eighth Circuit found that these facts did not establish that the officer "had an objectively reasonable suspicion that the occupants of the Nova were involved in criminal activity in order to justify stopping it under Terry v. Ohio." Id. at 759. The court emphasized that Supreme Court precedent requires an officer making a Terry stop to have "something more than an inchoate and unparticularized suspicion or hunch." Id. (quoting Alabama v. White, 496 U.S. 325, 329 (1990)).

6

Defendants contend that Thompson is not on point, and rely instead on United States v. Juvenile TK, 134 F.3d 899 (8th Cir. 1998). In that case, tribal police received a call at approximately 3:00 am that a man had broken out a window in a small village on the reservation, and that he had gotten into a gray car and had a gun. Id. at 900. Officers did not receive any other information about the car. While investigating, the officer received another report that a male at a nearby gas station had brandished a weapon, stolen cigarettes, and gotten into a gray vehicle. Id. at 901. As the officer was driving toward the gas station, he saw a gray car make a U-turn in a parking lot near the gas station. Id. Police followed the vehicle in their marked squad car, and ultimately activated the squad's flashing lights. Id. When the squad car pulled behind the gray car, the gray car made a quick left, but then stopped. Id. The officers thought that the gray car was trying to evade them. Id.

The Eighth Circuit upheld the District Court's determination that the stop was constitutional, emphasizing that "both innocent and criminal acts can create reasonable suspicion." Id. at 903. In particular, "police are entitled to be suspicious of vehicular movement that, while not illegal, may be reasonably perceived as evasive." Id. The court found that two reports of "clearly criminal activity" only 40 minutes apart, and "more important, the vehicle's temporal and geographic proximity to the crime scenes" made TK's stop "easily distinguishable" from Thompson. Id. at 904. The court pointed out that unlike the reports of criminal activity in TK, in Thompson "there was no report that the defendants were even involved in a crime." Id.

7

Defendants' reliance on TK is misplaced. Unlike TK and the cases discussed therein, there were no reports of criminal activity here. Rather, a caller merely said that she was tired of cars parking "to get drugs" on her street. She did not offer any specifics regarding her complaint, nor did she identify a particular vehicle that was allegedly involved or even state that the alleged drug activity was happening at the time of her call. When Sather drove down the street after the call, the only reason he was suspicious of Heard's car was because it was unfamiliar to him. She did not violate any traffic laws, and it was 7:00 pm, a time when it is still light and many people are on the roads. In TK and other similar cases, the suspicious-car reports came in the middle of the night, when there were few, if any, other cars around. While Sather later said that he believed Heard's car was trying to elude him, this is the only fact that could possibly point to any suspicious activity.

The constitutionality of a Terry stop is a question of law, Thompson, 968 F.2d at 759, and here the undisputed facts taken in the light most favorable to Defendants establish that they did not have any particularized reasonable suspicion to stop or question Heard. Thus, Heard has established a violation of her constitutional rights. Moreover, given the authority cited above, it was clearly established long before August 2016 that police could not stop or detain an individual without particularized reasonable suspicion. Defendants are not entitled to qualified immunity as to their initial encounter with Heard.

## C. Excessive Force

"Since this case presents an issue of whether an officer used excessive force, the case must be analyzed under the Fourth Amendment's objective reasonableness standard." Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005) (quotation omitted).

> [P]roper application [of the objective reasonableness standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Graham v. Connor, 490 U.S. 386, 396 (1989) (citation omitted). When applied to excessive-force claims, "the test is whether the amount of force used was objectively reasonable under the particular circumstances." Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994). These considerations should be made without regard for the officer's subjective intent or motivation. Graham, 490 U.S. at 397.

There are two questions involved in determining whether the officers here used excessive force. "First, did the officers have the right to seize plaintiff[]? Second, if the officers had the right to seize plaintiff[], did they use excessive force in effecting that seizure?" Nguyen v. Lokke, No. 11cv3225, 2013 WL 4747459, at *3 (D. Minn. Sept. 4, 2013) (Schiltz, J.) (emphasis omitted). "[B]efore a police officer can use physical force, the arrest or investigatory stop itself must be justified." Smith v. Appledorn, No. 11cv2966, 2013 WL 451320, at *3 (D. Minn. Feb. 6, 2013) (Ericksen, J.). "[O]fficers do not have the right to use any degree of force against an individual whom the officers have no right to detain." Nguyen, 2013 WL 4747459, at *3 (quotation omitted). Moreover, it was clearly established in 2017 that "it would be unreasonable to use any amount of force to seize a

9

person" the officers had no particularized suspicion to stop or detain. Appledorn, 2013 WL 451320, at *5.

If the police officers did not have the right to stop Heard, it follows that they did not have the right to use any force against her. Defendants argue that, even if their initial encounter with Heard ran afoul of the Constitution, her threat to "shoot" them justified the force they used. See United States v. Dawdy, 46 F.3d 1427, 1431 (8th Cir. 1995) ("[A] defendant's response to even an invalid arrest or Terry stop may constitute independent grounds for arrest.").

But there are multiple factual disputes as to what occurred after Defendants initially encountered Heard. Thus, the Court cannot determine whether Defendants have established that Heard's response to their attempts to talk to her constituted independent grounds for the force they used to arrest her. The factfinder must evaluate the evidence to determine, for example, whether Heard said "sue" or "shoot," and how an objectively reasonable officer would have interpreted her statements. See id. (noting that reasonableness of arrest assessed objectively, not subjectively). Once the factfinder makes the relevant factual determinations, the Court can determine whether those facts establish a violation of Heard's rights, and if so, whether those rights were clearly established.

**D. Retaliatory Arrest**

The Supreme Court recently ruled that an individual may not raise a claim for retaliatory arrest when there was probable cause for the arrest. Nieves v. Bartlett, 17-1174, 587 U.S. ___ (May 28, 2019). Here, however, there are questions of fact as to whether the officers had probable cause to arrest Heard after her statements to them, and thus summary

judgment on this claim is not appropriate.

**E.	Official Immunity**

"As distinguished from the 'qualified immunity' afforded peace officers when addressing 42 U.S.C. § 1983 claims, under Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion." Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990). The official immunity doctrine applies to police officers in situations like the one presented here, unless the official committed a willful or malicious wrong. Pletan v. Gaines, 494 N.W.2d 38, 40 (Minn. 1992). When considering whether an official has acted willfully or maliciously, courts "'consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited.' This 'contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions.'" Hassan v. City of Minneapolis, 489 F.3d 914, 920 (8th Cir. 2007) (quoting State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571-72 (Minn. 1994)).

Given the conclusion above that Defendants did not have reasonable suspicion to stop or detain Heard, official immunity does not bar Heard's state-law claims at this stage. Again, however, because there are factual disputes as to what occurred after the initial encounter, the ultimate application of official immunity must await the factfinder's determination.

11

**CONCLUSION**

There are multiple factual disputes that preclude the entry of summary judgment. Accordingly, **IT IS HEREBY ORDERED that** :

1. Defendants' Motion for Summary Judgment (Docket No. 32) is **DENIED**; and

2. Plaintiff's Motion for Partial Summary Judgment (Docket No. 42) is **DENIED**.

Dated:  June 5, 2019

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge
